JLG:KCM
F. #2024R00569

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

IGNACIO VITORIA APARICIO,
    also known as "Max," and
JEVGENIJS SANKINS,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

C O M P L A I N T

(T. 21 U.S.C. §§ 960(b)(1)(A)(ii)(II), 963;
T. 18, U.S.C., §§ 3551 et seq.)

24-MJ-561

EASTERN DISTRICT OF NEW YORK, SS:

        RYAN DUGGAN, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

        In or about and between May 2024 and November 9, 2024, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants IGNACIO VITORIA APARICIO, also known as "Max," and JEVGENIJS

SANKINS, together with others, did knowingly and intentionally conspire to import a controlled

substance into the United States from a place outside thereof, which offense involved a substance

containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code,

Sections 952(a) and 960(a)(1).   The amount of cocaine involved in the conspiracy attributable to

the defendants as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, was five kilograms or more of a substance containing cocaine.

(Title 21, United States Code, Sections 963 and 960(b)(1)(A)(ii)(II); Title 18, United States Code, Sections 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed as such since 2017.   I am presently assigned to the FBI's Long Island Resident Agency ("LIRA"), Long Island Gang Task Force (hereinafter, the "Task Force"), which seeks to combat gang-related violence, including murders and assaults, as well as other dangerous gang activity, such as narcotics trafficking, weapons possession and trafficking, and money laundering, on Long Island and beyond.   The Task Force is comprised of law enforcement agents and officers from federal, state, and local agencies and police departments, including and especially the Nassau and Suffolk Police Departments.   During my tenure with the FBI, I have participated in numerous criminal investigations into narcotics trafficking and importation, and related money laundering; and through my training, education, and experience, I have become generally familiar with the manner in which illegal drugs are imported, transported, distributed, prepared, packaged, and sold, and the manner in which individuals involved in the distribution of illegal drugs communicate and coordinate their activities, and finance their operations.   As part of these investigations, I have conducted physical surveillance,

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

monitored undercover operations, debriefed cooperating witnesses and confidential informants, monitored wiretaps, and executed search warrants and arrest warrants.

2.     I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement agents and officers involved in the investigation.

3.     Since in or about May 2024, the Task Force has been investigating an international drug trafficking organization, Los Diablos (the "Los Diablos DTO"), based in Cartagena, Colombia, which regularly ships barges containing hundreds of kilograms of cocaine to ports in Barcelona and Valencia, Spain, for distribution.   Based on the investigation to date, as described further herein, defendant IGNACIO VITORIA APARICIO, also known as "Max," (hereinafter, "APARICIO"), has been identified as a business associate of the Los Diablos DTO, based in Spain, who facilitates the movement of cocaine from cargo vessels shipped from Colombia to be sold to buyers in Spain.   Furthermore, based on the investigation to date, as described further herein, defendant JEVGENIJS SANKINS (hereinafter, "SANKINS"), has been identified as a friend and business associate of APARICIO, who assists in the movement of narcotics into the hands of buyers.

4.     In approximately May 2024, a New York-based associate of the Los Diablos DTO informed members of the Task Force, in substance and in relevant part, that he/she had been contacted by a Colombia-based independent narcotics broker, whom the business associate knew from living in Colombia (hereinafter, "Co-Conspirator-1"), who offered the business associate an opportunity to be involved in a multi-kilogram shipment of cocaine from Colombia to a certain distributor in Spain, who was referred to as "Max" – an individual who was subsequently identified, as described herein, as defendant APARICIO.

5.    In furtherance of the investigation, in approximately July 2024, the business associate introduced a law enforcement officer acting in an undercover capacity (hereinafter, the "UC") to the Los Diablos DTO as a potential investor in the multi-kilogram shipment of cocaine.   Based on my conversations with the UC, as well as my review of text-message communications between the business associate and Co-Conspirator-1, I have learned, in substance and in relevant part, that the proposed shipment was to be a total of 100 kilograms of cocaine, which would ship on a barge from Colombia to a port in Spain, and would be received there by defendant APARICIO.

6.    On or about July 17, 2024, the UC attended two in-person meetings in Valencia, Spain, with defendant APARICIO.   Both of these meetings were recorded by the UC, and monitored and surveilled by law enforcement.[2]   During the course of these two meetings, which are described further herein in substance and in relevant part, defendant APARICIO described his role in the importation of kilogram-quantities of cocaine and other narcotics from Colombia into the shipping port at Puerto de Sagunto, in Valencia, Spain.

a.    Based on my review of a draft translation and transcript of the first of these two meetings, and on my conversations with the UC, I have learned, in substance and in relevant part, that, during the earlier meeting, defendant APARICIO informed the UC that "[m]any things have gotten in through this port," and further, that he (APARICIO) anticipated that they could import the 100 kilogram shipment of cocaine through this port as well, since law enforcement presence at this port is lighter than at the port in Barcelona.

---

[2]    The participants in these meetings, as well as in other meetings described herein, conversed in Spanish.   The translated transcriptions of these conversations set forth herein are draft translations/transcriptions, and are set forth only in part.

b.      Based on my review of a draft translation and transcription of the second of these two meetings, and on my conversations with the UC, I have learned, in substance and in relevant part, that, during the later meeting, defendant APARICIO gave the UC a tour of the port in Valencia, during which defendant APARICIO described the methods he and his associates use to import narcotics into the port via cargo ships.   For example, during their conversation, defendant APARICIO explained to the UC how the narcotics are packaged and then moved off ships docked at the port:

| | |
|---|---|
| UC: | Yes, so you usually work with packages? |
| APARICIO: | Yes, with packages, everybody knows what it is arriving. |
| UC: | Yeah. |
| APARICIO: | The people who are working there know what it is. In other words, whoever is inside knows what it is. |
| UC: | But that… the packages come inside a bag or…? |
| APARICIO: | Of course, they come in duffle bags as they call them, in backpacks… |
| UC: | Backpacks… |
| APARICIO: | … with 25 or 30 units each… |
| UC: | Okay… |
| APARICIO: | That way you can grab it… |
| APARICIO: | … They would tell us where they are putting it, and the person who puts in the ship is the one that I want to come here so he/she can say, "It is there. It is there."   It would be with my stuff, and that person would get it out; they would be with my stuff and he/she would get it out, that person is called notary. |
| UC: | That's how you've been working? |
| APARICIO: | Yes. |

| APARICIO: | … his people, the working group as they call it… |
|---|---|
| UC: | And does he deliver to you outside? |
| APARICIO: | Outside. Outside. I would tell him, "Listen, I want you to deliver it to me here or I want you to deliver to me by the box. [PH]." That would arrange according to where the stash place is going to be… |

7.     On or about September 19, 2024, the UC attended an in-person meeting in Bogota, Colombia, hosted by the Colombia-based leaders of the Los Diablos DTO.   This meeting was recorded by the UC, and monitored and surveilled by law enforcement.   Present at this meeting were, *inter alia*, defendant APARICIO; Co-Conspirator-1; the Colombia-based leader of the Los Diablos DTO (hereinafter, "Co-Conspirator-2"); the accountant for the Los Diablos DTO (hereinafter, "Co-Conspirator-3"); and the attorney for Co-Conspirator-2 (hereinafter, "Co-Conspirator-4").   The purpose of this meeting, which is further described herein in substance and in relevant part, was to discuss the prospect of the UC's investment in the shipment of 100 kilograms of cocaine from the Los Diablos DTO, which would be packaged in, and shipped from, Cartagena, Colombia, and sent to Spain, for distribution.

a.     Based on my review of a draft translation and transcription of this meeting, and on my conversations with the UC, I have learned, in substance and in relevant part, that, during the September 19, 2024 meeting, Co-Conspirator-2 offered to sponsor the 100-kilogram shipment of cocaine to Spain, in which Co-Conspirator-2 would pay for half (*i.e.*, 50 kilograms of cocaine), and its related packaging and shipping costs, and the UC would cover the cost of the other half.   Once the shipment arrived in Spain, defendant APARICIO would be in charge of receiving it at the port, and selling the UC's portion.   During the course of this meeting, defendant APARICIO informed the UC that the UC would directly pay APARICIO

approximately $25,000 for defendant APARICIO to receive and sell in Spain the UC's half (50 kilograms) of the cocaine shipment, for a profit.   Further, during this meeting, defendant APARICIO and Co-Conspirator-2 discussed their own terms and logistics involving the sale of Co-Conspirator-2's half of the shipment, as well as future drug shipments.

    b.    Furthermore, during this meeting, the UC stated that, before agreeing to pay for the 50-kilogram shipment upfront, the UC wanted to purchase 10 kilograms of cocaine from Co-Conspirator-2 in Colombia, at the current market price, as a test for the quality of the cocaine and viability of the Los Diablos DTO and its distribution network.   Co-Conspirator-2 agreed, and offered to be personally present for the sale of the 10 kilograms of cocaine in Cartagena, Colombia, to a designated associate of the UC, who would thereafter import the cocaine into the United States for distribution.   The UC and Co-Conspirator-2 further agreed to an initial payment, in cash, for these 10 kilograms of cocaine.   Finally, it was agreed that an initial payment towards the UC's investment in the larger (100 kilogram) shipment would be made soon after the 10-kilogram test was completed.   The UC advised Co-Conspirator-2 that the UC's money was mostly in cash and was maintained in the United States.   Co-Conspirator-2 assured the UC that Co-Conspirator-2 could quickly and easily establish a contact in the United States, who would receive the bulk cash from the UC in the United States, and thereafter transmit it to Colombia.   Shortly thereafter, Co-Conspirator-2 and Co-Conspirator-4 began making phone calls, in the presence of the UC, to line up the United States contact.

    8.    On or about October 1, 2024, defendant APARICIO called the UC via Telegram.[3]   Based on my conversations with the UC, I have learned, in substance and in

---

    [3]    Telegram Messenger, commonly known as Telegram, is a cloud-based, cross-platform, social media and instant messaging (IM) service.   It allows users to exchange

relevant part, that, during this call, which was recorded, defendant APARICIO inquired about the timing of the UC's payments for his/her portion of the investment in the cocaine shipment.

9.      On or about and between October 2, 2024 and October 6, 2024, defendant APARICIO sent the UC numerous messages via Telegram.   Based on my review of the draft translations of these messages, and on my conversations with the UC, I have learned, in substance and in relevant part, that, in these messages, defendant APARICIO sent the UC photographs of bricks of cocaine, bearing the logo "JORDAN 23."   Attached below are screenshots, obtained from the UC, of certain of these communications.



In response, the UC stated that he/she would be in New York in the coming week to prepare the cash payment for the 10-kilograms of cocaine.   Additionally, in Telegram communications occurring on or about October 6, 2024, defendant APARICIO sent the UC a photograph which depicted approximately 41 bricks of cocaine, stacked against a wall, with a piece of paper

messages, share media and files, and hold private and group voice or video calls as well as public livestreams.   Telegram offers end-to-end encryption in voice and video calls, and in optional private chats, which Telegram calls Secret Chats.   Here, while the UC and APARICIO were in Spain, as discussed above, they exchanged contact information so that they could keep in touch during the course of their business dealings.

displaying the date "OCTUBRE 5." In the photograph, which is attached below, one of the bricks depicts the logo for the soccer team Real Madrid.



During these Telegram conversations, defendant APARICIO told the UC, in substance and in part, that these bricks of cocaine (which appear in the photograph) had already been sent to him, as part of a separate narcotics transaction between defendant APARICIO and Co-Conspirator-2.

10.    On or about October 17, 2024, the UC received a phone call via Telegram from defendant APARICIO, which the UC missed. Based on my conversations with the UC, and my review of a draft transcription and translation of the call, which was recorded, I have learned, in substance and in relevant part, that, when the UC returned the phone call, via Telegram, defendant APARICIO encouraged the UC to begin making payments on the UC's investment in the cocaine as soon as possible. The UC informed defendant APARICIO that the UC would soon travel to New York to prepare to deliver the cash payment for the agreed upon 10-kilogram cocaine test purchase, which was destined for New York, as well as the UC's investment in the larger cocaine shipment from Colombia to Spain, as discussed during the September 19 meeting.

11.    Later that day (October 17, 2024), the UC participated in a recorded WhatsApp[4] video call with Co-Conspirator-1, Co-Conspirator-2, and Co-Conspirator-3.   Based on my conversations with the UC, I have learned, in substance and in relevant part, that, during this call, the participants discussed the details surrounding the narcotics transactions previously negotiated on September 19, whereby the UC would first purchase 10 kilograms of cocaine from Co-Conspirator-2 as a test, which would be provided to an associate of the UC sometime during the week of October 21, 2024 in Cartagena, Colombia, and which would thereafter be smuggled into the United States for distribution.   Per the agreement, the UC would provide cash payment for the 10-kilogram transaction to an associate of Co-Conspirator-2 in New York.

12.    On or about October 23, 2024, defendant APARICIO and the UC again communicated via Telegram.   Based on my conversations with the UC, I have learned, in substance and in relevant part, that, during the course of these communications, defendant APARICIO informed the UC that he had spoken with Co-Conspirator-2, and confirmed that the cocaine transaction would take place on October 25, 2024.

13.    On or about and between October 23, 2024 and October 25, 2024, Co-Conspirator-1 provided the UC with the contact information for an individual who Co-Conspirator-1 identified, in substance, as a money launderer working with the Los Diablos DTO (hereinafter, "Co-Conspirator-5"), who would accept the UC's bulk cash payment for the 10-kilograms of cocaine in New York.   The UC and Co-Conspirator-5 then exchanged several WhatsApp messages on or about October 24, 2024, regarding logistics for the UC's planned

---

[4]    WhatsApp (officially WhatsApp Messenger) is an instant messaging (IM) and voice-over-IP (VoIP) service.   It allows users to send text, voice messages and video messages, make voice and video calls, and share images, documents, user locations, and other content.

11

delivery of $18,500 in cash at an agreed-upon location, namely, the Roosevelt Field Mall in Garden City, New York, the following day.

14.     On or about October 25, 2024, the UC and defendant APARICIO spoke via Telegram voice message.   Based on my conversations with the UC, I have learned, in substance and in relevant part, that, during this call, defendant APARICIO sought an update from the UC.   The UC accurately informed defendant APARICIO that no one had arrived to pick up the UC's cash payment, despite the plan.   Thereafter, as further described herein, defendant APARICIO and the UC exchanged several direct messages, voice messages, and voice calls via Telegram, during which defendant APARICIO sought to take greater control over the transaction to ensure that it occurred.

a.     For example, during the communications between the UC and defendant APARICIO on that day, defendant APARICIO explained to the UC how to utilize a certain one-dollar bill as a verification "token," that would be provided by the person sent by Co-Conspirator-5 to pick up the UC's cash payment.   Based on my review of draft translations and transcriptions of these messages, and on my conversations with the UC, I have learned, in substance and in relevant part, that, during these communications between the UC and defendant APARICIO, it was agreed that after the UC delivered the $18,500 cash to Co-Conspirator-5's designated courier, the UC was to write the amount delivered and the date on the dollar bill, photograph it, and send the photograph via Telegram to defendant APARICIO as verification that the payment was made.   Thereafter, 10 kilograms of cocaine would be provided in

Cartagena, Colombia to the UC's designated associate.[5]   The draft transcription and translation

of a portion of a recorded conversation between the UC and defendant APARICIO follows:

| | |
|---|---|
| APARICIO: | Ok, don't worry.   Hand it over, send me the photo for me to send it, and-and, if it's necessary, I would even… |
| UC: | What photo do I have to send you? |
| APARICIO: | Let's see, you are there? They give you a token, right? |
| UC: | Yes, yes. |
| APARICIO: | So send his photo for me to forward it to this man… you write down the amount that you have handed over. |
| UC: | Okay, the token is just a photo of the bill? |
| APARICIO: | Yes.   You send me the photo of the bill, you hand over to the man, ok? You write down the amount, as they told you… |
| UC: | In a piece of paper? |
| APARICIO: | On the bill, you write down the amount that you hand over. |
| UC: | Okay. Yes, yes.   So you want a photo of the bill with the piece of paper? |
| APARICIO: | Yes, you write down the amount on the bill… and send me the photo as you have delivered it.   That's it. |
| UC: | I will write it down the amount on the bill and send you the photo. |
| APARICIO: | Okay.   Done.   In the meantime, I am going to talk to him. |

15.    Later that same day, the money courier sent by Co-Conspirator-5

(hereinafter, "Co-Conspirator-6"), arrived at the designated location, which, as noted above, was

---

[5]    The UC's associate was, as described below, another member of law enforcement, acting in an undercover capacity.

a parking lot at the Roosevelt Field Mall, in the Eastern District of New York. This meeting

was recorded by the UC, and monitored and surveilled by law enforcement. Based on my

review of the draft transcription and translation of the recording, and on my conversations with

the UC, I have learned, in substance and in relevant part, that, during this meeting, Co-

Conspirator-6 entered the UC's vehicle and proceeded to hand the UC a one-dollar bill. The UC

thereafter provided $18,500 cash to Co-Conspirator-6, who then counted the money in front of

the UC. Co-Conspirator-6 then took the cash, left the UC's vehicle, and drove away. Shortly

after the meeting with Co-Conspirator-6, the UC sent the below photograph of the "token" to

defendant APARICIO via Telegram, to serve as confirmation of the transaction, as described

above.



16.    In or about and between October 26, 2024 and October 29, 2024,

defendant APARICIO and the UC exchanged several communications via Telegram discussing

the 10 kilogram cocaine transaction for which the UC had just provided payment. Based on my

conversations with the UC, as well as my review of draft translations and transcriptions of these

communications, I have learned, in substance and in relevant part, that, during the course of

14

these communications, defendant APARICIO and the UC discussed the availability of additional funds from the UC for an even larger shipment – that of 200 kilograms of cocaine.    Thereafter, based on the UC's representation that he/she had funding for this larger shipment, defendant APARICIO confirmed that the Los Diablos DTO could and would ship 200 kilograms of cocaine from Colombia to Spain, which APARICIO would receive there, and distribute the UC's portion for a profit.

17.    On or about October 29, 2024, defendant APARICIO sent the UC two videos via Telegram.    Based on my conversation with the UC, I have learned, in substance and in relevant part, that defendant APARICIO told the UC that these videos were sent to him from Co-Conspirator-2.    The videos depicted numerous bricks of cocaine, wrapped in black plastic and displaying the logo "ROYAL BRAND."    Screenshots of portions of these videos are included below.



18.    On or about October 29, 2024, defendant APARICIO and the UC spoke over Telegram voice message.   This conversation was recorded by the UC.   Based on my conversations with the UC, and my review of a draft translation and transcription of the recording, I have learned, in substance and in relevant part, that, during this conversation, defendant APARICIO offered to travel to New York himself to facilitate the larger 200-kilogram transaction, in an effort avoid the issues which had delayed the 10-kilogram test transaction.   A portion of that conversation follows:

> APARICIO:    One thing, if you want, I told you the other day and I tell you now… If you want I can take a plane and go there with you, so everything is right and perfect… in communication with him.   I don't have any issue doing that, okay?   What I want is for everybody to be correct,

calm, and for everything to come out well... to not have any mistakes.   I have no problem doing that, okay?

UC:          Yes, well, if you want to come here, that's fine, but that's not necessary.   They are telling me that supposedly the person that is going to receive from me here for the next one, will be the same person as the other day.   I have no issue with that.

APARICIO:   Well, I am thinking about it, and I think I will go... for everything to be correct.   I'll see if I can collect a little money and I will go.

19.     On or about October 31, 2024, the UC and defendant APARICIO exchanged communications via Telegram.   Based on my review of the draft translations and transcriptions of these messages, and my conversations with the UC, I have learned, in substance and in relevant part, that, in these messages, defendant APARICIO and the UC discussed the receipt of the 10 kilograms of cocaine in Colombia, which had not yet been received by the UC's representative.   Later that day, the UC informed defendant APARICIO that the UC could have his/her representative available the week of November 2 to receive the cocaine.

20.     On or about November 3, 2024, the UC and defendant APARICIO conducted a phone call, which was recorded by the UC.   Based on my review of a draft translation and transcription of this phone call, and my conversations with the UC, I have learned, in substance and in relevant part, that, during this conversation, the UC and defendant APARICIO discussed the availability of the UC's representative to meet that Tuesday in Colombia to receive the cocaine.   Furthermore, defendant APARICIO informed the UC that he intended to travel to New York on Friday, November 8, to ensure that the payment for the UC's half of the forthcoming 200-kilogram shipment would move forward seamlessly.

21.     On or about November 4, 2024, the UC and defendant APARICIO again spoke via Telegram, in a call that was recorded by the UC.   Based on my conversations with the

UC, and my review of a draft translation and transcription of that phone call, I have learned, in substance and in relevant part, that, during the call, the UC confirmed with defendant APARICIO that the UC would be in New York on Thursday, and would be ready to deliver the entire amount – approximately $500,000 in cash – to Co-Conspirator-2's representative on Friday, November 8, 2024, as payment for the UC's portion of the 200-kilogram cocaine transaction.

22.     In furtherance of this investigation, on or about November 6, 2024, another law enforcement officer acting in an undercover capacity – whom the UC claimed to the Los Diablos DTO was his associate in Colombia – met with an individual in Bogota, Colombia, at the direction of defendant APARICIO, and received 10 kilograms of cocaine.   A sample of this cocaine was field tested by law enforcement, and tested positive for the presence of cocaine. Photographs of these 10 kilograms are included below:







23.    Furthermore, on or about November 6, 2024, defendant APARICIO

contacted the UC via Telegram messenger.   Based on my conversations with the UC, as well as

my review of the draft transcript and translation of this conversation, I have learned, in substance

and in relevant part, that APARICIO forwarded to the UC a text-message from Co-Conspirator-2, in which Co-Conspirator-2 informed APARICIO that he would only accept installment payments in $100,000 increments for the UC's larger payment, rather than one large lump sum payment. APARICIO, speaking on behalf of Co-Conspirator-2, further informed the UC that Co-Conspirator-2 would accept multiple $100,000 payments per day, but that no payment could be more than $100,000 at one time.

24.     On or about November 7, 2024, defendant APARICIO contacted the UC via Telegram messenger. This conversation was recorded by the UC. Based on my review of a draft translation and transcription of this recording, and on my conversations with the UC, I have learned, in substance and relevant part, that defendant APARICIO stated that he would be taking a flight from Spain to New York, which would arrive in New York on the evening of Friday, November 8. Additionally, the UC and APARICIO discussed meeting at a local hotel near the airport the morning after APARICIO's arrival, in order for the UC to hand over the cash payment for the cocaine shipment to a courier of Co-Conspirator-2's, and for APARICIO to oversee and facilitate this transaction.

25.     Based on my review of flight records and my conversations with law enforcement authorities in Spain, I have learned, in substance and in relevant part, that, on November 8, 2024, APARICIO and SANKINS boarded Air Europa Flight 91, originally departing from Valencia, Spain, with a connecting flight from Madrid, Spain, destined for John F. Kennedy International Airport, in Jamaica, New York ("JFK"). Later that day, at 5:50 p.m. EST, APARICIO and SANKINS arrived at JFK. Based on my conversations with the UC, I have learned, in substance and in part, that, shortly after the flight's arrival at JFK, APARICIO contacted the UC via WhatsApp to inform the UC of his arrival in New York.

26.     On or about November 9, 2024, at approximately 10:00 a.m. EST, APARICIO arrived at the Hilton Garden Inn, Jamaica, New York, accompanied by SANKINS, to receive $100,000 in cash from the UC, representing the UC's first installment payment for the UC's portion of the 200-kilogram shipment of cocaine.   This meeting was recorded by the UC, and was monitored and surveilled by law enforcement.   Based on my conversations with the UC, and my involvement in the surveillance, I have learned, in substance and in relevant part, that, during the course of this meeting, which took place in a hotel room on the second floor, APARICIO introduced SANKINS to the UC as his friend and business associate.   Moreover, during this meeting, the UC was informed, in substance and in part, that SANKINS was the individual who facilitated the movement of the 10 kilograms of cocaine in Colombia to the UC's associate for distribution in the United States.   During this meeting, the UC removed $100,000 in show money from a black backpack.   The UC and APARICIO then proceeded to count the $100,000 with the use of a currency counter.   Shortly thereafter, APARICIO and SANKINS were arrested by law enforcement.

27.     Following his arrest, SANKINS was advised of his Miranda rights, and agreed to waive those rights and to speak with law enforcement.   SANKINS thereafter admitted to law enforcement, in substance and in part, that he had helped facilitate the 10-kilogram cocaine transaction in Colombia on or about November 6, 2024, discussed above.

WHEREFORE, your deponent respectfully requests that the defendants

IGNACIO VITORIA APARICIO, also known as "Max," and JEVGENIJS SANKINS, be dealt

with according to law.

RYAN DUGGAN
Special Agent, Federal Bureau of Investigation

Sworn to before me this
10th day of November, 2024

THE HONORABLE LARA K. ESHKENAZI
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK